2005-NMCA-028

107 P.3d 532

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**James Kyle BOERGADINE, Defendant–Appellant.**

**Nos. 23,766, 23,767.**

Court of Appeals of New Mexico.

Jan. 14, 2005.

Certiorari Denied, No. 29,061, March 2, 2005.

Patricia A. Madrid, Attorney General, James O. Bell, Santa Fe, NM, for Appellee.

John Bigelow, Chief Public Defender, Cordelia A. Friedman, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

*OPINION*

KENNEDY, Judge.

{1} In this case, we hold that Defendant's fraudulent taking of three payments in the course of completing work on one vehicle's transmission justifies convicting him of three counts of fraud pursuant to NMSA 1978, § 30–16–6 (1987). Defendant James Kyle Boergadine appeals his conviction of three counts of fraud. Defendant also appeals the resulting revocation of his probation in another case that is consolidated with this one for purposes of this appeal. Defendant asserts that: (1) the three fraud counts were for one course of conduct, so that his conviction for all three violated double jeopardy; (2) discovery violations and other prosecutorial misconduct warrant reversal on the basis of fundamental error; (3) his trial counsel was ineffective; (4) these errors are cumulative error; and (5) because his fraud convictions should be reversed, they could not be a basis for the revocation of his probation. Defendant's reliance on what he sees as a single course of conduct is misplaced, when it was he who requested further payments and changed the terms of the agreement without performing his obligations. Because we find no error below, we affirm Defendant's convictions for the reasons stated herein.

## FACTUAL AND PROCEDURAL BACKGROUND

{2} On February 11, 2002, Cheyenne Redhouse (Redhouse) took her vehicle to Defendant for transmission repairs. Defendant told Redhouse that the repairs would cost $1000. Redhouse did not have this amount, and Defendant told her that she could put $400 down for parts. Defendant told her that she "can just give [him money] little by little." Defendant accepted a check for $350 from Redhouse, but instructed her not to make the check payable to him since he did not have any identification to cash it. The check was made payable to Defendant's fiancee and subsequently cashed.

{3} Redhouse came to see Defendant again on February 17, 2002. Nothing had been done on her car. Defendant told Redhouse that he needed more parts, and Redhouse's husband gave Defendant $300 in cash. De-

fendant told Redhouse that "he might need some more money if there's other parts that needs [sic] to be done," and that he would contact her.

{4} Almost two months later, Redhouse spoke to Defendant again. Defendant told her that he needed another $1200, but that this amount should "cover the whole thing." On April 18, 2002, Redhouse gave Defendant this amount in cash. Sometime later, when the vehicle repairs had not been done, Redhouse again spoke to Defendant. Defendant told Redhouse that he would not give her the parts she had paid for or repair the vehicle. Defendant took Redhouse's vehicle to a repair shop, which contacted Redhouse to do the repairs. Redhouse later testified that a note had been left in her vehicle saying the money she had paid to Defendant was for storage fees.

{5} In May 2002, Defendant was charged by complaint with only one count of fraud for the $350 check, although the attached affidavit described all three times that Redhouse gave Defendant money. Defendant pled not guilty to a subsequent criminal information containing three counts of fraud.

{6} A number of issues arose pre-trial, including untimely additions to the prosecution's witness list. The prosecution's initial witness list named Redhouse, Detective Wyatt, and Officer Marshall. The prosecution later sought to add five more witnesses, who were barred from testifying at trial.

{7} Defendant also sought production of an N.C.I.C. criminal report on Redhouse "just for credibility purposes." The trial court ordered the prosecution to disclose if Redhouse had any prior criminal convictions and to give Defendant an N.C.I.C. report if the State already had one. The court specifically relieved the prosecution of the need to obtain such a report if it did not already have one in its possession. The court later informed Defendant that a "[r]ap sheet" could be obtained from the sheriff's office, and that it would order one released to Defendant if necessary.

{8} Defendant was unable to obtain a copy of the cancelled check, and it was never produced, despite Defendant moving to com-

pel discovery, sending a subpoena to Redhouse, and obtaining a court order compelling its production. Defendant had only seen a carbon copy of the front of the check, and not any indorsement on its back. Defendant further sought to prevent any mention of the check at trial based only on the non-disclosure of the cancelled check. The trial court allowed Redhouse to testify about the check while ruling that the cancelled check itself could not be introduced if found.

{9} In its opening statement at trial, the prosecution stated that three of the previously excluded witnesses were present, and that one, Redhouse's daughter, could testify "if necessary." The prosecutor also previewed "testimony" that the other excluded witnesses might give. At no point during this opening did Defendant's counsel object.

{10} In Defendant's opening statement, Defendant's counsel challenged whether Redhouse ever wrote the $350 check based on its absence from evidence. He told the jury that they were not going to see the check "because it doesn't exist. It was never written." He would later reiterate this argument in closing statements.

{11} At trial, Officer Marshall, Redhouse, and Detective Wyatt testified. After the State rested, Defendant's counsel moved for a directed verdict, which was denied. Defendant's counsel presented no witnesses, going directly to closing arguments. The court then gave a separate instruction for each count of fraud without objection from Defendant. Each instruction described one of the times that Redhouse had given Defendant money, including the $350 check, the $300 in cash, and the final $1200 cash payment. The jury found Defendant guilty of all three charges of fraud. Defendant now appeals those convictions.

## DOUBLE JEOPARDY

### Unit of Prosecution

 {12} Defendant argues for the first time on appeal that his convictions were in violation of the Double Jeopardy Clauses of the State and Federal Constitutions. This issue may be properly raised for the first time on appeal. *State v. Soto*, 2001–NMCA–098, ¶ 12, 131 N.M. 299, 35 P.3d 304. Double

jeopardy challenges, which raise the issue of the unit of prosecution under a single statute, become questions of statutory construction, and are reviewed de novo. *Id.* ¶ 13. Under this standard, we approach the question of whether, on the facts above, Defendant's three convictions violated double jeopardy.

{13} Although Defendant invokes both the State and Federal Constitutions, we read and analyze these two provisions in the same manner. *State v. Rogers*, 90 N.M. 604, 606, 566 P.2d 1142, 1144 (1977). The Double Jeopardy Clause provides that no one will be "twice put in jeopardy" for the same crime. U.S. *Const. amend.* V; N.M. *Const. art.* II, § 15. This clause protects against three distinct dangers. "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *Swafford v. State*, 112 N.M. 3, 7, 810 P.2d 1223, 1227 (1991) (internal quotation marks and citation omitted). Second prosecution cases are analyzed differently than multiple punishment cases. *Id.*

{14} Multiple punishment cases are further divided into two more categories: multiple convictions under one statute (unit of prosecution cases) and multiple convictions under multiple statutes for the same course of conduct (double description cases). *Id.* at 8, 810 P.2d at 1228; *State v. Barr*, 1999–NMCA–081, ¶ 11, 127 N.M. 504, 984 P.2d 185. For example, *Swafford* is a double description case since the defendant was convicted of both criminal sexual penetration and incest for one incident. *Swafford*, 112 N.M. at 6–7, 810 P.2d at 1226–27. Here, on the other hand, Defendant was convicted of three counts of the same fraud statute. We accordingly treat Defendant's double jeopardy challenge as a unit of prosecution issue. *See Barr*, 1999–NMCA–081, ¶ 11, 127 N.M. 504, 984 P.2d 185.

{15} Unit of prosecution cases use a two-step analysis. *Id.* For these type of cases, we must first ask whether the statute "clearly define[s] the unit of prosecution." *Soto*, 2001–NMCA–098, ¶ 13, 131 N.M. 299, 35 P.3d 304. A unit of prosecution issue, "though essentially constitutional, becomes one of statutory construction." *Barr*, 1999–NMCA–081, ¶ 13, 127 N.M. 504, 984 P.2d 185 (internal quotation marks and citation omitted). The question then becomes "whether the legislature intended punishment for the entire course of conduct or for each discrete act." *State v. Alvarez–Lopez*, 2004–NMSC–030, ¶ 40, 136 N.M. 309, 98 P.3d 699 (internal quotation marks and citation omitted) (alteration in original). If a statute's unit of prosecution is clearly defined, we must look no further than the face of the statute. *Id.; Barr*, 1999–NMCA–081, ¶ 14, 127 N.M. 504, 984 P.2d 185. However, if the statute is ambiguous, we must apply the rule of lenity, where "doubt will be resolved against turning a single transaction into multiple offenses." *Id.* (internal quotation marks and citation omitted). Under the rule of lenity we presume that "the [L]egislature did not intend to fragment a course of conduct into separate offenses." *Alvarez–Lopez*, 2004–NMSC–030, ¶ 40, 136 N.M. 309, 98 P.3d 699 (internal quotation marks and citation omitted) (alteration in original). However, this rule does not apply if the second step of the unit of prosecution test is not satisfied. *Barr*, 1999–NMCA–081, ¶ 15, 127 N.M. 504, 984 P.2d 185. The second step uses a number of factors to determine whether there was a "sufficient showing of distinctness" between a defendant's acts. *Id.* ¶¶ 15–16. We now turn to the facts of this case to apply this test.

{16} The fraud statute reads in relevant part:

> Fraud consists of the intentional misappropriation or taking of anything of value which belongs to another by means of fraudulent conduct, practices or representations.

> . . . .

> Whoever commits fraud when the value of the property misappropriated or taken is over two hundred fifty dollars ($250) but not more than twenty-five hundred dollars ($2,500) is guilty of a fourth degree felony.

Section 30–16–6. Under this statute, the more valuable the thing misappropriated or taken, the higher the degree of felony with which a defendant may be charged. *Id.*

{17} Defendant argues that this charging scheme shows that the unit of prosecution is clearly defined in the fraud statute as the total value of misappropriations or takings. If correct, then Defendant could only have been convicted of one felony, since the total value of his takings was $1,850. Defendant further asserts that this argument is supported by the similarities between Section 30–16–6 and NMSA 1978, § 30–16–1 (1987) (larceny), NMSA 1978, § 30–16–11 (1987) (receiving stolen property), and NMSA 1978, § 30–16–16 (1987) (falsely obtaining services or accommodations).

{18} With regard to the comparison to Sections 30–16–11 and 30–16–16, Defendant's contention is without further argument or citation to case law. *See In re Adoption of Doe,* 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984) (declining to review issues where counsel cited no authority in support thereof). Defendant's argument focuses on larceny. We therefore only address that statute.

{19} Our Supreme Court has held that the larceny statute clearly defines the unit of prosecution. *See Alvarez–Lopez,* 2004–NMSC–030, ¶ 41, 136 N.M. 309, 98 P.3d 699. However, the unit of prosecution is not always based on the total value of the things taken. *Id.* The unit of prosecution may be based on the *nature* of the thing taken. *Id.* In *Alvarez–Lopez,* the Court held that the defendant could be charged with both the general larceny provision (larceny over $250) and the specific larceny provision (larceny of a firearm) of Section 30–16–1 without violating double jeopardy. *Id.* It also held that the legislature had intended to specifically target larceny of firearms as opposed to other things, and thereby created separate units of prosecution for different types of items. *Id.* ¶ 42.

{20} The fraud statute does not have such categorical distinctions for the nature of the items taken. It does not clearly define its unit of prosecution. The question then is whether Defendant's acts were sufficiently distinct. *See Barr,* 1999–NMCA–081, ¶ 17, 127 N.M. 504, 984 P.2d 185; *State v. Morro,* 1999–NMCA–118, ¶ 11, 127 N.M. 763, 987 P.2d 420 (stating that when the face of the statute "provides no answer," we apply the distinctiveness test as "a canon of construction").

{21} In the context of a sexual assault case, *Herron v. State,* 111 N.M. 357, 361, 805 P.2d 624,' 111 N.M. 357, 805 P.2d 624, 628 (1991), delineated a six factor test for determining whether a defendant's actions are distinct enough to form the basis of separate crimes. That test has since been widely applied to different kinds of cases, including but not limited to burglary and larceny. *See, e.g., Soto,* 2001–NMCA–098, ¶¶ 12–15, 131 N.M. 299, 35 P.3d 304 (applying the *Herron* test to multiple convictions for burglary); *State v. Brown,* 113 N.M. 631, 632–34, 830 P.2d 183, 184–86 (Ct.App.1992) (applying the *Herron* test to multiple convictions for larceny). The test includes the following factors: "(1) temporal proximity of the acts; (2) location of the victim(s) during each act; (3) existence of an intervening event; (4) sequencing of acts; (5) defendant's intent as evidenced by his conduct and utterances; and (6) the number of victims." *Barr,* 1999–NMCA–081, ¶ 16, 127 N.M. 504, 984 P.2d 185; *Morro,* 1999–NMCA–118, ¶ 19, 127 N.M. 763, 987 P.2d 420. As *Herron* stated, "none of these factors alone is a panacea." 111 N.M. at 362, 805 P.2d at 629. We may also consider whether Defendant's acts were "performed independently" of the other acts "in an entirely different manner," or whether such acts were of a "different nature." *Id.* at 361, 805 P.2d at 628. We hold that these considerations may be added to the flexible set of factors set out above.

{22} The first factor we address is the "temporal proximity" of Defendant's three fraudulent acts. *Id.* "[T]he greater the interval between acts the greater the likelihood of separate offenses." *Id.* Here, Defendant first took a $350 check from Redhouse on February 11. Six days later, on February 17, Redhouse gave Defendant $300 in cash. Two months later, on April 16, Defendant requested more money from Redhouse, and on April 18, Defendant received another $1200 in cash. Each time that Defendant took money from Redhouse, he had not done any work on her car. The lengthy stretches of time between these acts and the individual

false requests for additional sums of money for parts supports three separate convictions for Defendant's acts.

{23} The second and fourth factors are location of the victim and sequencing of the acts. These factors are more tailored to sex offenses, emphasizing that "movement or repositioning of the victim between penetrations" and the sequence in which different orifices were penetrated "tend[s] to establish separate offenses." *Id.* While other scenarios might find an application of these factors useful, we do not.

{24} Defendant may have told Redhouse that she could pay "little by little" for the repairs, but that is not what happened. Defendant first told Redhouse that the repairs would cost $1000. However, Redhouse ended up paying him a total of $1,850. The cash payments were not fixed, but in fact were made in direct response to distinct and independent acts of Defendant. Defendant defrauded Redhouse out of each amount on separate occasions. The first cash payment was instigated by Defendant's assertion that Redhouse's car needed more parts. Defendant then told Redhouse, nearly two months later, that $1200 should "cover the whole thing." Each cash transaction was accompanied by different assurances; the first, that he would contact Redhouse, the second, the implication that the $1200 would suffice for the repairs. Here, the sequence of events is less salient than seeing that each act of fraud was distinct and separate from the others by the nature and manner of the transactions, the behavior of Defendant between, and the intervening acts of assurance. The independence, nature, and manner of Defendant's acts is relevant to our consideration of the third factor; whether there were any events that arose between one act and another. *Id.* Under this factor, which overlaps with other factors like Defendant's intent, we may also look at "the behavior of the defendant between" the acts. *Id.* Here, despite Defendant's arguments, he did not just accept the additional cash payments as part of some installment plan. An installment plan is the "arrangement of the payment of a sum of money by fixed portions at fixed times." Oxford English Dictionary 1039 (2d ed.1989).

{25} The "defendant's intent as evidenced by his conduct and utterances" is the fifth factor of our analysis. *Herron,* 111 N.M. at 361, 805 P.2d at 628. Defendant would have us hold this factor dispositive, arguing that Defendant had a "single, unitary intent." Defendant cites *State v. Pedroncelli,* 100 N.M. 678, 681, 675 P.2d 127, 130 (1984), for the proposition that taking the three payments was driven by the same intent to defraud, so Defendant could only be charged with one count of fraud. *Pedroncelli,* however, was decided seven years before *Herron* set out the test we use now, and we hold that the latter is controlling. Yet having ignored the other *Herron* factors, Defendant asks us to place an undue emphasis upon the intent factor. The fact that Defendant specifically requested additional cash payments for different purposes, which he accompanied by various assurances and justifications, supports the jury's finding that on each occasion, he had a separate intent to defraud.

{26} Defendant does not argue that the evidence was insufficient to support these findings. Rather, Defendant appears to rely on the fact that on each occasion his intent was generally the same intent to defraud over a "protracted" period of time. Were we to agree with this analysis, a defendant could never be charged with more than one count of any statute containing one mental element such as getting money from a victim. We reject this reasoning, and consider the last factor of our analysis.

{27} The final factor of the *Herron* analysis asks if each count is for a separate victim, as "multiple victims will likely give rise to multiple offenses." *Herron,* 111 N.M. at 361, 805 P.2d at 628. We note at the outset that the reverse is not always true, and that here, Redhouse is the only described victim. *Herron* itself only dealt with one victim. *Id.* at 362, 805 P.2d at 629. *Herron* found that digital penetration and penile penetration of one victim were "sufficiently distinct" under that case's criteria to support additional counts. *Id.* Accordingly, we hold that in conjunction with our assessment of the factors above, Defendant's acts were distinct enough to support three convictions of fraud,

and hence, the rule of lenity does not apply. *See Barr,* 1999–NMCA–081, ¶ 15, 127 N.M. 504, 984 P.2d 185.

### Single Larceny Doctrine

{28} Defendant argues that the single larceny doctrine should be applied to the fraud statute. Defense counsel cites *State v. Rowell,* 121 N.M. 111, 908 P.2d 1379 (1995), only for the proposition that the legislature never intended three punishments for a temporally fragmented misappropriation, absent any evidence of a separate criminal intent. Here, there was evidence that Defendant had a separate intent for each of his convictions. Defense counsel otherwise ignores *Rowell,* except to cite it for a general proposition on legislative intent. Defendant makes an argument identical to the State's contention in *Rowell,* where the prosecution argued that the defendant's conduct was "part of one fraudulent scheme" and that his acts "constitute[d] a single crime because [the defendant] had the same intent in each situation." *Id.* at 116–17, 908 P.2d at 1384–85. Defendant proposes the very arguments that the Court in *Rowell* rejected. Addressing three acts resulting in a single conviction under the computer fraud statute, NMSA 1978, § 30–45–3 (1989), *Rowell* refused to apply the single larceny doctrine where the "single larcenous scheme involves multiple victims, locations, and time periods." *Rowell,* 121 N.M. at 117, 908 P.2d at 1385. These are, essentially, some of the very indicia of distinctiveness we already analyzed under the second prong of the unit of prosecution analysis. *See Morro,* 1999–NMCA–118, ¶ 10, 127 N.M. 763, 987 P.2d 420. Considering that the charging scheme in *Rowell* is nearly identical to the fraud statute, *Rowell* has adequately disposed of this issue.

{29} Under the single larceny doctrine, "[w]hen several articles of property are stolen by the defendant from the same owner," either at one time or in a series of takings, as long as there is only a "single criminal intent," then "only one larceny is committed." *Rowell,* 121 N.M. at 116–17, 908 P.2d at 1384–85 (internal quotation marks and citation omitted) (alteration in original). Defendant argues that we should apply this doctrine to fraud even though our legislature amended the embezzlement statute in direct response to our application of it in *State v. Brooks,* 117 N.M. 751, 752, 877 P.2d 557, 558 (1994). Since the fraud statute does not have such an amendment, Defendant invites us to apply the doctrine our legislature disfavors. We decline to do so. "This amendment evinces the legislature's intent to restrict the single-larceny doctrine. We will not enlarge a doctrine while the legislature works to contract it." *Rowell,* 121 N.M. at 118, 908 P.2d at 1386 (declining to apply the single larceny doctrine to the defendant's three separate acts). We hold the single larceny doctrine inapplicable to the fraud statute until our legislature dictates otherwise.

## PROSECUTORIAL MISCONDUCT

### Issue Not Preserved

{30} Defendant claims that the failure to disclose the check and an N.C.I.C. report, plus the prosecution's opening statements, were prosecutorial misconduct. Defendant does not state how or where the issue of prosecutorial misconduct was preserved under Rule 12–213(A)(4) NMRA. Without an appropriate cite to the record, we do not comb the record to find whether an issue was properly preserved. *See State v. Rojo,* 1999–NMSC–001, ¶ 44, 126 N.M. 438, 971 P.2d 829. As such, we need not address this contention.

### Fundamental Error

{31} Defendant thus asks us to apply the doctrine of fundamental error to the prosecutor's comments during opening statements. Defense counsel did not object to any portion of the prosecution's opening statements when the prosecution referred to the testimony of witnesses who had been excluded. Rule 12–216(B)(2) NMRA allows this Court to consider questions of fundamental error even if the issue was not preserved below. As we noted in *State v. Trujillo,* 2002–NMSC–005, ¶ 52, 131 N.M. 709, 42 P.3d 814:

Prosecutorial misconduct rises to the level of fundamental error when it is so egregious and had such a persuasive and preju-

dicial effect on the jury's verdict that the defendant was deprived of a fair trial. An isolated, minor impropriety ordinarily is not sufficient to warrant reversal, because a fair trial is not necessarily a perfect one. (internal quotation marks and citation omitted). The prosecution's comments were limited to opening statements and did not give a great amount of detail. The prosecutor noted that several of the excluded witnesses were present. The prosecutor also said that one barred witness had suggested that Redhouse take her car to Defendant, that he and another man had gone to see Defendant about the car, but that no one was there, and that this witness had spoken to Defendant's fiancee, receiving assurances that Defendant was still going to fix Redhouse's car. While intentional and inappropriate, the statements are not sufficiently "egregious" to constitute fundamental error. *See State v. Allen*, 2000–NMSC–002, ¶ 95, 128 N.M. 482, 994 P.2d 728. They are, in fact, an "isolated, minor impropriety" that did not deprive Defendant of a fair trial. *See id.*

## INEFFECTIVE ASSISTANCE OF COUNSEL

{32} Rule 12–213(A)(4) requires that counsel set forth the applicable standard of review for claims of ineffective assistance of counsel. Having again failed to do so, which failure is repeated throughout Defendant's brief, we urge Defendant's counsel to review and follow the rules of appellate procedure. We cannot ignore the irony of such a reminder in an argument centered on the errors of counsel below.

{33} The standard of review for claims of ineffective assistance of counsel is de novo. *State v. Joanna V.*, 2003–NMCA–100, ¶ 11, 134 N.M. 232, 75 P.3d 832. Under the guidance of this standard, Defendant must show: "(1) that [ ] counsel's performance fell below that of a reasonably competent attorney, and (2) that [counsel's] deficient performance prejudiced the defense." *State v. Franco*, 2004–NMCA–099, ¶ 14, 136 N.M. 204, 96 P.3d 329, *cert. denied*, 2004–NMCERT–008, 136 N.M. 491, 100 P.3d 197, and *cert. granted*, 2004–NMCERT–008, 136 N.M. 492, 100 P.3d 198. As for competence,

Defendant needs to show that no "plausible, rational trial strategy or tactic can explain defense counsel's conduct." *Id.* To show prejudice, Defendant must show that "the allegedly incompetent representation prejudiced the case such that but for counsel's error, there is a reasonable probability that the result of the conviction proceedings would have been different." *State v. Gee*, 2004–NMCA–042, ¶ 22, 135 N.M. 408, 89 P.3d 80 (internal quotation marks and citation omitted). Both prongs place the burden on Defendant. *State v. Hester*, 1999–NMSC–020, ¶ 9, 127 N.M. 218, 979 P.2d 729. Furthermore, "[a]bsent a showing of both incompetence and prejudice, counsel is presumed competent." *Gee*, 2004–NMCA–042, ¶ 22, 135 N.M. 408, 89 P.3d 80 (internal quotation marks and citation omitted). We now apply these rules.

{34} Defendant argues that his counsel was ineffective in: (1) not moving to reduce the number of fraud counts from three to one, (2) his or her handling of the discovery of the cancelled check and N.C.I.C. report, (3) not motioning for dismissal, and (4) not objecting to the prosecutor's references to the testimony of excluded witnesses in opening statements. As Defendant only mentions issues three and four in a heading, but makes no further reference to or argument about these issues, we will not address them. Thus, we first ask whether Defendant made a sufficient showing of incompetence on the first issue.

{35} As we hold above, the record does not support Defendant's contention that the three incidents should have been one count, not three. Failure to make futile motions is not ineffective assistance of counsel. *State v. Chandler*, 119 N.M. 727, 735, 895 P.2d 249, 257 (Ct.App.1995). The testimony of the prosecution's witnesses supported viewing Defendant's acts as separate. Defendant offered no witnesses to rebut such testimony. Having held that Defendant's three convictions were supported by sufficient indicia of separateness, we cannot say that it was incompetent for counsel not to argue otherwise below.

{36} Defendant next argues that his counsel was ineffective in his or her handling of the discovery of the cancelled check and the N.C.I.C. report. As for the N.C.I.C. report, Defendant points to nothing in the record that would indicate that the prosecution ever had such a report. Defendant concedes that he does not know if Redhouse even has any prior convictions subject to mandatory disclosure. *See* Rule 5–501(A)(5) NMRA (mandating disclosure by prosecution of witness's prior convictions). A mere desire to have a report is insufficient to show materiality. *See Trujillo,* 2002–NMSC–005, ¶ 50, 131 N.M. 709, 42 P.3d 814 (stating that materiality requires that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" (internal quotation marks and citation omitted)). Thus, Defendant has not shown that his trial counsel was ineffective in acquiescing to the trial court's refusal to order disclosure of the N.C.I.C. report.

{37} Lastly, Defendant argues that his trial counsel was incompetent in the manner in which the discovery of the cancelled check was handled. Below, Defendant's counsel acquiesced to the trial court's ruling to suppress the check, did not otherwise press the issue, and did not ask for a continuance to obtain the check. Defendant argues that having the check would have supported the theory that he never received the proceeds of the cancelled check. This argument was not posited below. We have stated before that the "[a]rguments of counsel are not evidence" and cannot be used to support proposed facts. *State v. Wacey C.,* 2004–NMCA–029, ¶ 13, 135 N.M. 186, 86 P.3d 611. Instead, trial counsel argued that the check did not exist. As suppression of the check supported trial counsel's theory below, we cannot say that no "plausible, rational trial strategy or tactic can explain defense counsel's conduct." *Franco,* 2004–NMCA–099, ¶ 14, 136 N.M. 204, 96 P.3d 329. Furthermore, Defendant can not explain why, since trial counsel accepted the trial court's ruling as part of this strategy, it was incompetent not to request a continuance to obtain material that trial counsel apparently did not want admitted anyway. This argument is unavailing; Defendant did not receive ineffective assistance of counsel.

## CUMULATIVE ERROR

{38} Defendant states that we should apply the doctrine of cumulative error to the actions of his trial counsel. Defendant also suggests that the trial court was responsible for not limiting the errors of trial counsel. "The doctrine of cumulative error requires reversal when a series of lesser improprieties throughout a trial are found, in aggregate, to be so prejudicial that the defendant was deprived of the constitutional right to a fair trial." *State v. Duffy,* 1998–NMSC–014, ¶ 29, 126 N.M. 132, 967 P.2d 807. We believe that few errors occurred below; Defendant was not prejudiced to the point that he did not receive a fair trial.

## REVOCATION OF PROBATION

{39} Having affirmed Defendant's convictions for three counts of fraud, we will not disturb Defendant's revocation of probation based upon those convictions.

## CONCLUSION

{40} In affirming Defendant's convictions, we hold that: (1) Defendant's acts were sufficiently distinct to support three separate counts of fraud without violating double jeopardy and without implicating the single larceny doctrine; (2) the issues of prosecutorial misconduct were not properly preserved, and were not enough to rise to the level of fundamental error; (3) Defendant did not receive ineffective assistance of counsel; and (4) having affirmed Defendant's convictions, we will not disturb his revocation of probation.

{41} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER, Chief Judge, and JONATHAN B. SUTIN, Judge.